BART M. DAVIS, IDAHO STATE BAR NO. 2696
UNITED STATES ATTORNEY
JOSHUA DAVID HURWIT, IDAHO STATE BAR NO. 9527
FRANCIS J. ZEBARI, IDAHO STATE BAR NO. 8950
ASSISTANTS UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV, SUITE 600
800 EAST PARK BOULEVARD
BOISE, IDAHO 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-1413

**U.S. COURTS**

MAY 1 4 2019

Rcvd_____Filed_____Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES RAMSEY, a/k/a "GORDY," a/k/a "WHITEBRED,"<br>CHRISTOPHER FOSS, a/k/a "CUTTY,"<br>HARLAN HALE, a/k/a "HIZZY," a/k/a "HUDDLES,"<br>STEVEN BOWMAN, a/k/a "BIG PIMPIN," a/k/a "SLAYER,"<br>JEREMY BROWN, a/k/a "J.B.," aka "TRIGGER,"<br>NICHOLAS SITES, a/k/a "NICKY," a/k/a "JERSEY," a/k/a "NINJA,"<br>BUCK PICKENS, a/k/a "ROOSTER," a/k/a "ROO,"<br>LUCAS JOHNSON,<br>MICHAEL McNABB, a/k/a "M & M,"<br>MARK WOODLAND, a/k/a "WOODY,"<br><br>Defendants. | Case No. **CR 19-0158-S DCN**<br><br>**INDICTMENT**<br><br>18 U.S.C. § 2<br>18 U.S.C. § 1959(a)(3) and (a)(5)<br>18 U.S.C. § 1962(d)<br>18 U.S.C. § 1963 |

**INDICTMENT - 1**

The Grand Jury charges:

## COUNT ONE

### Conspiracy to Participate in a Racketeering Enterprise
### 18 U.S.C. § 1962(d)

#### THE RACKETEERING ENTERPRISE

1.     At all times relevant to this Indictment, the defendants, JAMES RAMSEY a/k/a "GORDY," a/k/a "WHITEBRED;" CHRISTOPHER FOSS, a/k/a "CUTTY;" HARLAN HALE, a/k/a "HIZZY," a/k/a "HUDDLES;" STEVEN BOWMAN, a/k/a "BIG PIMPIN," a/k/a "SLAYER;" JEREMY BROWN, a/k/a "J.B.," aka "TRIGGER;" NICHOLAS SITES, a/k/a "NICKY," a/k/a "JERSEY," a/k/a "NINJA;" BUCK PICKENS, a/k/a "ROOSTER," a/k/a "ROO;" LUCAS JOHNSON; and MICHAEL McNABB, a/k/a "M & M," were, along with other individuals both known and unknown, members of an organization named the Aryan Knights (the AK).

2.     The AK was formed in the mid-1990s in the Idaho Department of Correction (IDOC) prison system.  It is a prison gang that operates within IDOC prison facilities, which are all in the District of Idaho, but also outside of IDOC facilities in the District of Idaho.  It was founded to organize criminal activity for a select group of white inmates within IDOC custody. The AK had white supremacist and white separatist ideologies.

3.     Since its founding, the AK has continued to exist without pause.  It is believed to have approximately 165 members within IDOC prison facilities and another 100 members who have been released from IDOC custody.

4.     The AK had a leadership structure through which gang decisions were made, orders were given, and discipline on members was carried out.  The AK used associates and

members who had been released from prison to smuggle drugs and other contraband into IDOC and to conduct gang business outside of IDOC facilities. The AK used extortion, violence, and other methods to target non-white inmates and other targeted inmates, to promote its standing among IDOC inmates, to generate revenue, and to retaliate against its enemies. The AK also used drug trafficking, extortion, and gambling to promote its standing among IDOC inmates and to generate revenue, which was shared among members.

5.      The AK recruited new members through, among other methods, offers of access to prison commissary goods, drugs and money, threats, intimidation, and protection in prison. New members, known as "prospects," went through a probationary period during which they had to prove that they were worthy of becoming an AK member. A prospect typically was required to commit two acts of violence to become a member, earning a "letter" ("A" and "K") for each act. The acts of violence had to be sanctioned and observed by other AK members. The membership of each prospect was approved by the AK's leadership structure. Particularly violent acts, acts that resulted in new criminal charges, and assaults against IDOC staff were particularly valued and could result in quick acceptance into the AK. Once admitted, a new member was allowed to tattoo the letters "A" and "K" on his body.

6.      The AK had an evolving code of conduct or laws. The rules were typically communicated orally by senior members in order to avoid creating written documents that could be incriminating. The code included the following:

      a.      The AK was premised upon a white separatist and/or white supremacist ideology, which included a general rule not to associate with or share a prison cell with non-white inmates. AK members were also encouraged to assault non-white inmates;

    b.       The AK had a leadership structure that generally managed the activities of the AK and was organized by rank, including "soldier," "enforcer," "sergeant," "big homie," "lieutenant," and "captain;"

    c.       Members were to run a "good program," which included, among other things, obeying the decisions of leaders and working out regularly to remain physically conditioned to prevail in assaults and violent confrontations;

    d.       Members were to carry out assaults and other crimes when ordered to by AK leaders;

    e.       The AK attempted to determine which inmates had cooperated with law enforcement and then targeted them for violent assaults, extortion, or other retaliation;

    f.       Members shared profits from criminal activities with other members and AK leadership. This included providing commissary goods to each other;

    g.       AK leaders could impose discipline on members. By way of example, members who violated gang rules or procedures were required to submit to a "discipline punishment" or "D.P." in which they were assaulted for a set amount of time or received a certain number of physical blows;

7.       AK members held meetings and otherwise associated with each other within IDOC prison facilities. Formal meetings tended to be brief or were held in prison chapels to conceal their existence. Members who lived together in a housing unit communicated with each other to establish general knowledge of the AK's rules, structure, activities, and objectives. Members also communicated with each other through messages or third parties, including

associates living outside of IDOC prison facilities. Topics of discussion included resolving disputes within the AK and with other rival prison gangs, generating revenue, collecting debts, and punishment and assaults necessary to further the goals of the AK.

8.      At all times relevant to this Indictment, the AK, including its leaders, members and associates, constituted an "enterprise" as defined by 18 U.S.C. § 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise.

9.      The objectives of the enterprise included the following:

a.      Preserving and protecting the power and profits of the enterprise, as well as promoting respect among rivals of the enterprise, through the use of drug trafficking, contraband smuggling, extortion, intimidation, violence, including assaults and acts involving murder, and threats of physical injury;

b.      Generating revenue, mainly through drug trafficking, extortion, and gambling, to promote and enhance the enterprise and its members' and associates' activities and lifestyle within IDOC prison facilities;

c.      Providing financial support and information to gang members;

d.      Keeping victims and potential victims in fear of the enterprise and in fear of its members and associates through violence and threats of physical injury; and

INDICTMENT - 5

e.    Providing assistance to other gang members who committed crimes for, and on behalf of, the gang.

**Manner and Means**

The manner and means by which AK members and associates conducted and participated in the conduct of the affairs of the enterprise included, but was not limited to, the following:

10.    Leaders, members, and associates of the AK used any means necessary to generate revenue and to further the objectives of the enterprise.

11.    Leaders, members, and associates of the AK used extortion as a primary source of revenue and as a way to exert power and influence within the population of IDOC inmates. Through assaults, threats of assaults, and offers to secure physical safety, AK members, prospects, and associates obtained money, drugs, commissary, and other property from victims.

12.    Leaders, members, and associates of the AK used drug trafficking as a primary source of revenue and as a way to exert power and influence within the population of IDOC inmates. AK leaders, members, and associates engaged in smuggling drugs and other contraband not manufactured in Idaho into IDOC facilities through visitation and other means. Through extortion, threats, or otherwise, AK leaders, members, and associates also enlisted non-members to bring drugs into IDOC facilities where AK leadership could distribute the narcotics and keep the revenue for gang purposes.

13.    Leaders, members, and associates of the AK used gambling as a primary source of revenue and as a way to exert power and influence within the population of IDOC inmates. The AK assigned a member, prospect, or associate to operate gambling tables that existed within individual housing units in IDOC facilities. The AK member, prospect, or associate operating a specific gambling table was responsible for taking a percentage of the wagers from the table and

**INDICTMENT - 6**

distributing it back to the AK enterprise. The AK used violence and the threat of violence to collect gambling debts and its percentage of the wagers from a given table.

14.    Leaders, members, and associates of the AK engaged in various schemes to launder money that constituted the proceeds of its unlawful activities, which included drug trafficking, extortion, and gambling. As explained below, AK members used a corporate entity existing outside of IDOC prison facilities to launder the proceeds of its unlawful activities. AK leadership had various other ways to collect and distribute funds it derived from criminal activity, including transfers to and from the prison commissary accounts of IDOC inmates.

15.    Leaders, members, and associates of the AK communicated regarding (i) trafficking drugs into and within IDOC prison facilities, (ii) extorting other inmates, (iii) gambling operations, (iv) laundering or otherwise distributing revenue of the AK to members, and (v) disciplining AK members that violated the AK's code of conduct, among other things.

16.    Leaders, members, and associates of the AK agreed that acts of violence, including violent assaults and acts involving murder, would be committed by members, prospects, and associates of the AK against non-white inmates, inmates believed to have cooperated with law enforcement, rival gang members, and other targets of the gang as deemed necessary in order to enforce the power and authority of the AK through a climate of fear.

## THE RACKETEERING CONSPIRACY

17.    Beginning on or about at least January of 2000, and continuing through the present, in the District of Idaho and elsewhere, the defendants, JAMES RAMSEY, a/k/a "GORDY," a/k/a "WHITEBRED;" CHRISTOPHER FOSS, a/k/a "CUTTY;" HARLAN HALE, a/k/a "HIZZY," a/k/a "HUDDLES;" STEVEN BOWMAN, a/k/a "BIG PIMPIN" a/k/a "SLAYER;" JEREMY BROWN, a/k/a "J.B." a/k/a "TRIGGER;" NICHOLAS SITES, a/k/a

"NICKY," a/k/a "JERSEY," a/k/a "NINJA;" BUCK PICKENS, a/k/a "ROOSTER," a/k/a

"ROO;" LUCAS JOHNSON; and MICHAEL McNABB, a/k/a/ "M & M," being persons

employed by and associated with the AK, an enterprise engaged in, and the activities of which

affected, interstate and foreign commerce, together with others known and unknown, did

knowingly and intentionally conspire to violate 18 U.S.C. § 1962(c), that is, to conduct and

participate, directly and indirectly, in the conduct of the affairs of the AK enterprise through a

pattern of racketeering activity as defined in 18 U.S.C. § 1961(1) and (5), which pattern of

racketeering activity consisted of: (i) multiple acts involving the dealing in a controlled

substances chargeable under Idaho Code § 37-2732(a)(1), (f), and Idaho Code §§ 18-204, 306,

and 1701, and multiple offenses involving 21 U.S.C. §§ 841(a) and 846; (ii) multiple acts

involving extortion, chargeable under Idaho Criminal Code § 18-2403, 204, 306, and 1701; (iii)

multiple acts indictable under 18 U.S.C. § 1956 (relating to the laundering of monetary

instruments); (iv) multiple acts indictable under 18 U.S.C. § 1955 (relating to the prohibition of

illegal gambling businesses); (v) multiple acts involving murder chargeable under Idaho Code

§§ 18-204, 306, 1701, 4001, 4002, 4003(a), 4003(e), 4003(g), and 4004; and (vi) multiple acts

indictable under 18 U.S.C. §§ 892 and 894 (relating to extortionate credit transactions).

18.    It was part of the conspiracy that each defendant agreed that a conspirator would

commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

**Overt Acts**

19.    In furtherance of the conspiracy and to achieve the objective thereof, the

conspirators performed, or caused to be performed, the following overt acts, among others, in the

District of Idaho:

**INDICTMENT - 8**

a.      Starting in 2005, the AK began to threaten IDOC inmate VICTIM 1, who the AK believed to have cooperated with law enforcement in an unrelated investigation. An AK member demanded that VICTIM 1 purchase a pair of shoes for the AK member by threat of physical injury, which VICTIM 1 did. On or about 2006 or 2007, defendant BROWN demanded that VICTIM 1 purchase him commissary on a weekly basis by threat of physical injury, which VICTIM 1 did for several months. When VICTIM 1 was unable to satisfy one of BROWN's demands, AK members assaulted him.

b.      In 2006, AK members demanded that VICTIM 2, a white inmate, cease his religious activities with non-white inmates. When VICTIM 2 refused, an AK member assaulted VICTIM 2, breaking his jaw. The AK member then intimidated VICTIM 2 into not revealing the assault to IDOC staff.

c.      In 2008, two AK members assaulted IDOC inmate VICTIM 3, after he refused to join the AK. The assailants were prosecuted and the AK determined that VICTIM 3 had cooperated in the prosecution. In September 2008, a different AK member assaulted VICTIM 3. Defendant BROWN and another AK member forced VICTIM 3 to write a statement to exonerate the AK members who had assaulted VICTIM 3 initially. AK members, including defendant BROWN, then threatened to physically injure VICTIM 3 if he did not give them his prescription medication.

d.      In 2008, the AK believed that VICTIM 4 had previously been a law enforcement informant, and thus, decided to target VICTIM 4. The AK forced VICTIM 4 to smuggle drugs into an IDOC facility by threat of physical injury. When VICTIM 4 failed, an AK leader ordered an AK prospect to assault VICTIM 4. The prospect did so, but then

attempted to drop out of the AK. In retaliation for dropping out, defendant BROWN was involved in causing the prospect to be assaulted, which he was in the spring of 2009.

          e.     In 2008, the AK believed that IDOC inmate VICTIM 5 had cooperated with law enforcement. Defendant RAMSEY and another AK member threatened VICTIM 5. IDOC also intercepted a letter from defendant BOWMAN indicating that he intended to assault VICTIM 5. Starting in 2009, VICTIM 5 was assaulted at least twice by AK members and associates. In 2013, while out of prison, defendant BOWMAN posted on Facebook a list of law enforcement informants, which included VICTIM 5. In 2015, VICTIM 5 was assaulted again by an AK associate.

          f.     Beginning by late 2000s and continuing through the present, the AK conspired to, and actually did, smuggle significant quantities of drugs, typically methamphetamine, into IDOC prison facilities. The AK then distributed the drugs to other members, sold the drugs to other inmates, distributed and shared the proceeds, and personally used the drugs. AK members and associates smuggled drugs into IDOC through a variety of ways, including visitation contacts and contacts with associates during medical appointments outside of IDOC facilities. Defendants BOWMAN, FOSS, HALE, JOHNSON, PICKENS, RAMSEY, and SITES are among the AK members that participated in smuggling drugs into IDOC facilities, distributing the drugs, and collecting drug debts. For example:

          i.     In 2008, the AK recruited an inmate, COOPERATING WITNESS 1 (CW1), who was known to be able to smuggle significant quantities of drugs into IDOC facilities through visitation with his girlfriend. Over the next several years, CW1 smuggled pounds of methamphetamine into IDOC facilities. Defendants FOSS, HALE, and PICKENS, as

well as other AK members, participated in distributing the drugs once they were inside the prison facilities.

      ii.      In 2015, defendant HALE, as an AK leader, granted non-white inmates permission to sell drugs in a specific housing unit. An inmate incurred a debt to the non-white inmates and HALE assaulted the indebted inmate but then gave him additional drugs to sell in order to pay back the debt.

      iii.      In 2015, an inmate sold methamphetamine on behalf of defendant FOSS, who supplied the drugs. FOSS eventually became dissatisfied with the relationship and another AK member assaulted the inmate. Defendant JOHNSON helped coordinate the assault.

      iv.      In 2015-2016, defendants FOSS, JOHNSON, SITES, and RAMSEY arranged to smuggle drugs into IDOC facilities using a secret compartment engineered in the wheelchair of an inmate. Drugs were brought in through the wheelchair from visitation contacts.

      v.      In April 2016, defendant RAMSEY and others, including a long-time AK associate, arranged for the girlfriend of the AK associate to smuggle methamphetamine into an IDOC facility.

      vi.      In September 2016, defendants FOSS and RAMSEY, and others, arranged for an inmate to receive methamphetamine during an off-site physical therapy session. The drugs were placed in the bathroom for the inmate to retrieve.

      vii.      In September 2016, defendant FOSS sold methamphetamine that was being smuggled into IDOC by his girlfriend. FOSS distributed the drugs to AK members and other inmates. After FOSS tested positive for methamphetamine in a urinalysis test and was

INDICTMENT - 11

sent to administrative segregation, defendant SITES took over FOSS's drug distribution operations.

        viii.     As the overall leader of the AK from approximately 2016 to 2017, defendant RAMSEY established a system to provide a share of drugs and drug proceeds to all AK members who were available to receive them.

        g.     In 2012, a group of white IDOC inmates formed a new prison gang, Y.F.S. The AK viewed this group as an insult and a threat and wanted to stamp it out. IDOC policy was to separate rival gangs, thus, AK members and Y.F.S. members were normally let out of their cells at different times. AK members devised a plan to circumvent this security measure. When the AK members were released from their cells, they hid in closets, where they had stashed clubs, knives, and pots of boiling water. When the Y.F.S. members were released from their cells, the AK members attacked, severely injuring several members. Y.F.S. effectively disbanded after the attack.

        h.     VICTIM 6 is an IDOC inmate who had been a member of a rival gang to the AK. In 2010, VICTIM 6 attempted to join the AK but was not allowed. Instead, he was assaulted by an AK member. VICTIM 6 tried to buy peace with the AK by giving members money and commissary. Eventually, VICTIM 6 stopped making such payments. In 2012, defendant HALE assaulted VICTIM 6 and threw urine and feces on him. HALE was disciplined by IDOC and the AK believed that VICTIM 6 had cooperated with investigators. In 2015, another AK member attacked VICTIM 6, beating him until he was unconscious. In 2017, an AK prospect assaulted VICTIM 6 again. Shortly after the attack, this AK prospect received the "A" and "K" tattoos on his body, demonstrating he had been admitted as a full-fledged AK member.

i.      An associate of the AK had a business entity, "C.A." a purported legal services entity located outside of IDOC facilities but within the District of Idaho. C.A. had a bank account. Beginning in approximately 2015, defendants FOSS and RAMSEY, and other AK members, used C.A. and its bank account, to process drug proceeds. Specifically, defendants FOSS and RAMSEY, and other AK members, directed inmates who obtained drugs from the AK to send drug payments to C.A. in the guise of fees for legal services. The individuals that controlled C.A. then used the money received for the benefit of the AK and its members. For example, at the direction of defendants FOSS and RAMSEY, the individuals that controlled C.A. sent funds to pay the AK's drug suppliers and sent money to AK members and their associates.

j.      The AK suspected that IDOC inmate VICTIM 7 was a law enforcement informant. On April 22, 2015, defendant BOWMAN and an AK associate confronted VICTIM 7 in an IDOC bathroom and the AK associate struck VICTIM 7 with a closed fist, breaking the jaw of VICTIM 7.

k.      In 2016, AK members and associates, including defendants JOHNSON, SITES, and PICKENS, threatened IDOC inmate VICTIM 8 with physical injury if he did not make payments. VICTIM 8 made payments to an associate of the AK outside of IDOC prison facilities. PICKENS also forced VICTIM 8 to initiate phone calls that PICKENS would then take over and that were charged to the inmate account of VICTIM 8.

l.      In December 2016, AK members, including defendant SITES, threatened two separate inmates with threat of physical injury, directing them to send money orders outside of IDOC to the mother of another inmate that was living on the same tier as defendant SITES.

m.    CW2 is an AK member that is no longer in good standing. CW2 had previously served as an enforcer and sergeant in the gang. In the spring of 2016, CW2 was involved in a sexual relationship with an IDOC inmate who also was in a sexual relationship with defendant RAMSEY. CW2 and the inmate were engaged in their relationship behind RAMSEY's back and were also stealing drugs from RAMSEY and the AK's drug distribution operations. AK members found out and told RAMSEY, who ordered the assault of CW2. On June 15, 2016, defendant HALE and two other AK members assaulted CW2 with improvised knives, stabbing him repeatedly.

n.    In 2016, an IDOC inmate, CW3, was able to smuggle a cell phone into the IDOC facility where he lived. The AK found out and an AK prospect assaulted him for not "paying taxes" to the AK for possessing the contraband cell phone. CW3 then tried to make payments to the AK for his safety. He was directed to purchase a package of commissary goods costing $189 and CW3 did so. Defendant FOSS ultimately received the commissary. CW3 then made other payments to AK members, including FOSS, and associates.

o.    The Norteño gang is a rival gang to the AK. In December 2016, a Norteño gang member, VICTIM 9, incurred a drug debt to defendant FOSS. FOSS had directed VICTIM 9 to make payment to an associate on the outside of prison. This plan did not work, nor did the attempt by FOSS's associate to collect the debt from the mother of VICTIM 9. On December 3, 2016, two AK members separately assaulted VICTIM 9.

p.    VICTIM 10 was an IDOC inmate who had been a member of a rival gang to the AK. AK members had repeatedly told VICTIM 10 to cover his tattoos that indicated affiliation with the rival gang. In 2016, an AK member assaulted VICTIM 10. In February 2017, defendants BOWMAN and WOODLAND were moved into the same housing unit as

VICTIM 10. Shortly thereafter, BOWMAN and WOODLAND attacked VICTIM 10 with their fists and improvised knives, cutting VICTIM 10 repeatedly.

        q.     In 2016, the AK believed that IDOC inmate and former AK member, VICTIM 11, provided information to IDOC about the AK and specifically about defendant RAMSEY, the AK's overall leader at the time. Thereafter, IDOC moved defendant RAMSEY to a prison out of state and RAMSEY blamed VICTIM 11. Although he was out of state, RAMSEY continued to communicate with AK members and associates directly and through intermediaries. On May 25, 2017, an AK member assaulted VICTIM 11. Days later, a different AK member spoke with RAMSEY using the IDOC phone system and told RAMSEY of the assault on VICTIM 11, which RAMSEY sanctioned.

        r.     In August 2017, defendant McNABB and another AK member approached an inmate who was working as an FBI confidential human source, CW4. McNABB and the other AK member directed CW4 to make $500 monthly payments to them or they would physically injure him. Specifically, McNABB had CW4 make the payments to associates who were not in prison, which CW4 did for three months. By October 2017, McNABB had been sent to an administrative segregation housing unit. At this point, defendant BROWN took over the extortion and directed CW4 to make payments to associates who were not in prison by threat of physical injury.

        s.     In July 2018, an IDOC inmate, VICTIM 12, arranged to purchase a "store" of commissary from an AK associate. In IDOC prison terminology, a store is a collection of commissary that can be resold to other inmates at a profit. The AK associate accepted money from VICTIM 12, but then claimed that VICTIM 12 owed him more, threatening VICTIM 12 with physical injury. IDOC investigators found out and the AK

associate was sent to an administrative segregation housing unit, where he demanded that VICTIM 12 write a note to exonerate him. VICTIM 12 complied and wrote the note. Another AK member then threatened to assault VICTIM 12 if he did not pay the AK associate all the money demanded.

t.    Throughout its existence, the AK conducted gambling operations. The gambling operations included card games involving monetary wagers. Multiple AK members managed multiple tables where inmates played, and wagered bets on such card games. The AK took a percentage of every dollar wagered, as reflected in a ledger that was reconciled on a weekly basis.

All in violation of Title 18, United States Code, Section 1962(d).

## Special Sentencing Factors Regarding Count One
## 18 U.S.C. § 1962(d)

20.    From on or about January 2000 and continuing to the date of this Indictment, in the District of Idaho and elsewhere, the defendants JAMES RAMSEY, a/k/a "GORDY," a/k/a "WHITEBRED;" CHRISTOPHER FOSS, a/k/a "CUTTY;" HARLAN HALE, a/k/a "HIZZY," a/k/a "HUDDLES;" STEVEN BOWMAN, a/k/a "BIG PIMPIN" a/k/a "SLAYER;" NICHOLAS SITES, a/k/a "NICKY," a/k/a "JERSEY," a/k/a "NINJA;" BUCK PICKENS, a/k/a "ROOSTER," a/k/a "ROO;" and LUCAS JOHNSON, did conspire to deliver and possess with intent to deliver methamphetamine, a controlled substance classified in Schedule II, in violation of Idaho Code Sections 37-2732(a)(1)(A), 37-2732(f), 37-2707(d)(3) and Idaho Code Sections 18-204, and 1701.

21.    On or about June 15, 2016, in the District of Idaho, defendants HARLAN HALE a/k/a "HIZZY," a/k/a "HUDDLES," and JAMES RAMSEY, a/k/a "GORDY," a/k/a "WHITEBRED," knowingly and intentionally conspired and agreed together, and with persons

known and unknown, to commit the crime of first degree murder upon CW2, in violation of

Idaho Code §§ 18-204, 1701, 4001, 4002, 4003(a), 4003(e), and 4004.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO

### Attempted Murder and Assault With a Dangerous Weapon in Aid of Racketeering
### 18 U.S.C. § 1959(a)(3), (a)(5), and 18 U.S.C. § 2

22.     The allegations in paragraphs 1-16 are re-alleged and incorporated as if fully set

forth in this paragraph.

23.     At all times relevant to this Indictment, the AK, including its leaders, members,

and associates, constituted an "Enterprise," as defined in Title 18, United States Code, Section

1959(b)(2), that is, a group of individuals associated in fact, which was engaged in, and the

activities of which affected, interstate and foreign commerce.  The Enterprise constituted an

ongoing organization whose members functioned as a continuing unit for a common purpose of

achieving the objectives of the Enterprise.

24.     At all times relevant to this Indictment, the AK, the above-described Enterprise,

through its leaders, members and associates, engaged in racketeering activity, as defined in Title

18, United States Code, Sections 1959(b)(1) and 1961(1), consisting of (i) multiple acts

involving the dealing in a controlled substances chargeable under Idaho Code § 37 2732(a)(1),

(f), and Idaho Code §§ 18-204, 306, and 1701, and multiple offenses involving 21 U.S.C. §§

841(a) and 846; (ii) multiple acts involving extortion, chargeable under Idaho Criminal Code §

18-2403, 204, 306, and 1701; (iii) multiple acts indictable under 18 U.S.C. § 1956 (relating to the

laundering of monetary instruments); (v) multiple acts indictable under 18 U.S.C. § 1955

(relating to the prohibition of illegal gambling businesses); and (vi) multiple acts involving

murder chargeable under Idaho Code §§ 18-204, 306, 1701, 4001, 4002, 4003(a), 4003(e), 4003(g), and 4004..

25.     On or about June 15, 2016, in the District of Idaho, defendants HARLAN HALE and JAMES RAMSEY, for the purpose of maintaining and increasing position in the AK, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder and assault and cause to be assaulted with a dangerous weapon CW2, and did aid and abet to do the same, in violation of Idaho Code §§ 18-204, 306, 903(a), 907, 1701, 4001, 4002, 4003(a), 4003(e), 4004.

In violation of Title 18, United States Code, Section 1959(a)(3), (a)(5), and Title 18 United States Code, Section 2.

## COUNT THREE

### Attempted Murder and Assault With a Dangerous Weapon in Aid of Racketeering
### 18 U.S.C. § 1959(a)(3), (a)(5), and 18 U.S.C. § 2

26.     The allegations in paragraphs 22-24 of Count Two are re-alleged and incorporated as if fully set forth in this paragraph.

27.     On or about February 16, 2017, in the District of Idaho, defendants STEVEN BOWMAN and MARK WOODLAND, for the purpose of maintaining and increasing position in the AK, an enterprise engaged in racketeering activity, did knowingly and intentionally attempt to murder and assault with a dangerous weapon VICTIM 10, and did aid and abet the same, in violation of Idaho Code §§ 18-204, 306, 903(a), 907, 4001, 4002, 4003(e), 4004.

In violation of Title 18, United States Code, Section 1959(a)(3), (a)(5), and Title 18 United States Code, Section 2.

//

**INDICTMENT - 18**

## CRIMINAL FORFEITURE ALLEGATION

### RICO Forfeiture
18 U.S.C. § 1963

1.      The allegations contained in Count One of this Indictment are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963 and Title 28, United States Code, Section 2461(c).

2.      Upon conviction of the offense charged in Count One of this Indictment, the defendants, JAMES RAMSEY, a/k/a "GORDY," a/k/a "WHITEBRED;" CHRISTOPHER FOSS, a/k/a "CUTTY;" HARLAN HALE, a/k/a "HIZZY," a/k/a "HUDDLES;" STEVEN BOWMAN, a/k/a "BIG PIMPIN," a/k/a "SLAYER;" JEREMY BROWN, a/k/a "J.B.," a/k/a "TRIGGER;" NICHOLAS SITES, a/k/a "NICKY," a/k/a "JERSEY," a/k/a "NINJA;" BUCK PICKENS, a/k/a "ROOSTER," a/k/a "ROO;" LUCAS JOHNSON, and MICHAEL McNABB, a/k/a "M & M;" shall forfeit to the United States of America,

      a.      Any interest acquired or maintained in violation of section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

      b.      Any interests in, securities of, claims against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendant[s] established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a)(2); and

      c.      Any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

3.      If any of the property subject to forfeiture pursuant to Title 18, United States Code Section 1963(a)(1), (2), and (3), as a result of any act or omission of the defendants:

      a.      Cannot be located upon the exercise of due diligence;

      b.      Has been transferred or sold to, or deposited with, a third party;

      c.      Has been placed beyond the jurisdiction of the court;

      d.      Has been substantially diminished in value; or

      e.      Has been comingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property, pursuant to Title 18, United States Code Section 1963(m).

All pursuant to Title 18, United States Code Sections 1962, 1963(a)(1), (2), and (3), and 1963(m).

Dated this _14_ day of May, 2019.

A TRUE BILL

*of last page*

/s/ *[signature on reverse]*

_____

Foreperson

**INDICTMENT - 20**

BART M. DAVIS
United States Attorney
By:

_____
Joshua D. Hurwit
Francis J. Zebari
Assistants United States Attorney

**INDICTMENT - 21**